2005-NMSC-009

111 P.3d 701

William M. TURNER, in his official capacity as Trustee of and on behalf of Manzano Resources, an express, common law business trust, and Westwater Resources, an express, common law business trust, Plaintiffs–Respondents,

v.

Carroll G. BASSETT, Gordon R. Bassett, James N. Bassett, Bassett Brothers Water Sales Company, Hydro Source, Inc., a New Mexico corporation, Estancia Basin Water Supply, L.L.C., a New Mexico limited liability company, Edgewood Water Cooperative, Inc., a non-profit New Mexico corporation, and All Unknown Claimants of Interest in the Water Rights Adverse to Plaintiffs, Defendants–Petitioners.

No. 28,317.

Supreme Court of New Mexico.

March 7, 2005.

**382**

Sheehan, Sheehan & Stelzner, P.A., Susan C. Kery, Ray M. Vargas, II, Albuquerque, NM, for Petitioners.

Wolf, Taylor & McCaleb, P.A., Jolene Lucille McCaleb, Elizabeth Newlin Taylor, Wayne C. Wolf, Albuquerque, NM, for Respondents.

D.L. Sanders, R. Bruce Frederick, Santa Fe, NM, for Amicus Curiae Office of the State Engineer.

## OPINION

BOSSON, Justice.

█ {1} Fourteen years after the sale of a parcel of land in Edgewood, New Mexico, a dispute arose between the buyer, William Turner (Turner), and the sellers, the Bassetts, as to the ownership of associated water rights. Following a hearing, the district court granted summary judgment in favor of the Bassetts, finding in relevant part that the water rights had been properly severed from the land prior to its sale, and that even if the water rights had not been successfully severed, Turner's action was precluded by New Mexico's adverse possession statute, NMSA 1978, § 37–1–22 (1973). The Court of Appeals reversed, finding that the Bassetts had failed to sever the water rights, and that adverse possession of water rights cannot occur in New Mexico. On certiorari to this Court, the Bassetts challenge a portion of the Court of Appeals opinion, arguing that the water rights in question were severed prior to the land sale and did not transfer to Turner with the conveyance of land. In our examination of the severance issue, we agree with the district court and reverse the Court of Appeals. We also take this opportunity to clarify certain language in a previous opinion of this Court, *Sun Vineyards, Inc. v. Luna County Wine Dev. Corp.*, 107 N.M. 524, 760 P.2d 1290 (1988), and limit its effect. We hold that the State Engineer's permit to transfer location of water usage creates a rebuttable presumption of severance. Because Turner had no evidence with which to rebut that presumption, the presumption of severance holds.

## BACKGROUND

{2} In December 1984, Turner entered into a real estate contract to purchase roughly 130 acres of land in Edgewood from the Bassetts. For many years prior to the sale, Ray Bassett, predecessor in interest to Carroll G. Bassett, Gordon R. Bassett, James N. Bassett, Bassett Brothers Water Sales Company (collectively referred to as the Bassetts), had irrigated 125 acres of the land with 312.5 acre-feet (AF) of water, or 2.5 AF/acre of licensed and vested (diversion) water rights from well E–87, located on the property. In 1974, Ray Bassett filed an Application for Permit to Change Place or Purpose of Use, Combine and Appropriate Underground Waters (1974 application). The application requested permission to combine water from well E–87 with water from two other wells, E–544 and E–1107, and to sever the water from the property. This application described the Bassetts' plan to become a local water supplier in the Edgewood area by gradually converting their water use from irrigation to municipal and industrial applications. The application was approved in relevant part by the State Engineer, and a permit issued (1976 permit). The permit allowed the Bassetts to phase out irrigation on the property over time, while combining the water from well E–87 with water from other wells to provide water service to the growing Edgewood community.

{3} The permit required the Bassetts to file proof by December 15, 1976 that they were applying the water to beneficial use, as set forth in their application. The permit also required the Bassetts to furnish the State Engineer with data concerning the amount of water pumped for irrigation, the amount of land to be irrigated each season, and the metering of water diverted for non-irrigation purposes. In 1979, the Bassetts obtained a second permit from the State Engineer to enlarge the area in which the water could be used (1979 permit). This permit was subject to the same conditions as the earlier permit, including the requirement that the Bassetts submit proof that the water was actually applied to the new beneficial uses described in the application.

{4} Starting in late 1979, the Bassetts filed a series of applications for an extension of time to apply the water to beneficial use. Ten applications, filed annually until 1988, chronicle the Bassetts' gradual progress towards the transition from irrigation uses to supplying Edgewood community needs. The plan included the construction of the physical infrastructure necessary to connect the wells and deliver the water to the community, as well as monitoring the growth of the community and the anticipated need for water. The 1982 application for an extension of time states that "[a]ll irrigation has been stopped now" at each of the wells, including well E-87.

{5} Thus, the Bassetts complied with the permit conditions that required them to meter non-irrigation uses and submit use information to the State Engineer. However, at the time of the January 1985 sale to Turner, the Bassetts were not yet applying the full permitted amount of water to beneficial use at the new locations, and had not yet completed the prescribed administrative procedure of filing proof to the State Engineer that the permitted water was applied to the new beneficial use. The Bassetts concede that they were not exercising their entire water right during the 1980s. Therefore, at the time of the land conveyance to Turner, the Bassetts had not fully complied with the conditions set forth in either the 1976 or 1979 permit from the State Engineer.

{6} At the time of the real estate contract negotiations between the Bassetts and Turner, neither party discussed water rights. The Bassetts retained an easement to the well on the property and the right to rework the well, but importantly, they did not reserve water rights in the sale documents. Several years after the sale, Turner indicated that he was planning to develop a residential subdivision and did not intend to irrigate the property. Turner contemplated purchasing water for the subdivision from the Bassetts. In 1987, Turner submitted a petition for reclassification of land to the U.S. Department of Agriculture seeking to reclassify the property from "prime farm land" to "dry land." In the petition, Turner states that "[n]o water rights transferred with the land" when he purchased it from the Bassetts in 1985. He also acknowledged in the 1987 petition that the property had once been irrigated, but that the water formerly applied to irrigation was no longer available because it had been severed from the land.

{7} Turner became aware of a possibility that the Bassetts may not have successfully severed the water rights, when, in 1998, the Bassetts' successor in interest, Hydro Source, Inc., sought to convey the full amount of water rights described in the 1976 permit to Estancia Basin Water Supply, L.L.C. Hydro Source filed a change of ownership form with the State Engineer for the rights in the 1976 permit and the property's appurtenant irrigation water rights. Alerted to the possibility that his property might still have appurtenant water rights, Turner initiated an investigation, in which he was reminded that the Bassetts had not expressly reserved their irrigation water rights when they executed the warranty deed to Turner. In September 1998, Turner also filed a change of ownership of water rights with the State Engineer. In October 1998, Turner received a copy of a letter from the State Engineer to Carroll Bassett, noting that both parties had filed change of ownership of water rights for the same water, and requesting clarification.

{8} Turner then filed the underlying quiet title suit. The district court granted summary judgment in favor of the Bassetts. Even though the Bassetts had not reserved the water rights in the conveyance documents, the court found that the water rights had been severed prior to the land conveyance to Turner, and that even if the water rights had not been severed, the Bassetts had reacquired them through adverse possession. On appeal, the Court of Appeals reversed, finding that the water rights had not been severed prior to the conveyance, and that adverse possession of water rights cannot occur in New Mexico. The latter issue has not been appealed and is not before us. The sole issue on certiorari is whether the Bassetts' water rights had been severed, and thus were no longer appurtenant to the property, by the time of Bassetts' conveyance to Turner.

## DISCUSSION

### Standard of Review

{9} The district court determined that there were no material facts in dispute. The Court of Appeals agreed, but found that the district court erred as a matter of law in concluding that the Bassetts had successfully severed the appurtenant water rights prior to the conveyance to Turner. We now review de novo that issue of law. *Hasse Contracting Co. v. KBK Fin., Inc.*, 1999–NMSC–023, ¶ 9, 127 N.M. 316, 980 P.2d 641 ("Appellate courts review matters of law de novo.").

### Severance of Water Rights

{10} In New Mexico, water that is applied to irrigation becomes appurtenant to the land on which it is used. "[A]ll waters appropriated for irrigation purposes ... shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water, so long as the water can be beneficially used thereon." NMSA 1978, § 72–1–2 (1907). These water rights remain appurtenant to the land until they are severed. The requirements and procedures for the severance and transfer of appurtenant water rights are defined by state statutes and the administrative procedures of the State Engineer. *See* NMSA 1978, § 72–5–22 (1907); NMSA 1978, § 72–5–23 (1941),[1] and 19.26.2 NMAC (2005).

{11} In the case before us, the district court found that the water rights had been severed prior to the sale of the land. The court relied on two factors. First, the Bassetts had been issued a permit by the State Engineer to change the place and purpose of water usage, and second, the Bassetts had ceased irrigation of the land four years prior to the sale. *Turner v. Bassett*, 2003–NMCA–136, ¶ 11, 134 N.M. 621, 81 P.3d 564. Despite these undisputed facts, the Court of Appeals reversed, finding *Sun Vineyards*, 107 N.M. 524, 760 P.2d 1290 dispositive of

the issue. *Turner*, 2003–NMCA–136, ¶ 12, 134 N.M. 621, 81 P.3d 564.

{12} The Court of Appeals interpreted *Sun Vineyards* as articulating a comprehensive test for determining whether a severance has occurred as a matter of law, and the appellate court concluded that the district court had misapplied the test. *Id.* "In *Sun Vineyards, Inc.*, however, the Supreme Court specifically held that when a person claiming severance conveys property without reserving the water rights, that conveyance results in the discontinuation of the severance process." *Id.* ¶ 14, 760 P.2d 1290. Applying this test, the Court of Appeals concluded that the conveyance of land to Turner, lacking an express reservation of water rights, automatically discontinued the severance process because the Bassetts had not yet obtained a license. *Id.* "The deciding factor for determining whether severance has occurred is completion of the necessary administrative steps and procedures," which culminates in the issuance of a license. *Id.* ¶ 16, 760 P.2d 1290.

{13} The parties do not dispute that at the time of the land sale, the Bassetts had neither obtained a license from the State Engineer nor reserved water rights in the deed. Nonetheless, the Bassetts argue that the water was effectively severed from the property prior to the sale. The Bassetts had obtained a permit from the State Engineer which involved creating a detailed development plan, and then had progressed in implementing that plan towards the ultimate goal of supplying the water needs of the growing community of Edgewood. In making steady progress towards the approved goal, the Bassetts maintain that they have complied with all constitutional and statutory requirements for effecting a severance. *See* N.M. Const., art. XVI, § 3; NMSA 1978, § 72–12–2 (1931); § 72–5–22; § 72–5–23. Turner, on the other hand, analogizes this case to *Sun Vineyards*, and like the Court of Appeals, argues that the Bassetts' failure to complete

---

1. These statutes are part of the New Mexico Surface Water Code, but our courts have applied these same laws to cases involving the transfer of groundwater. *See Sun Vineyards, Inc.*, 107 N.M. at 527, 760 P.2d at 1293; *cf. McCasland v. Miskell*, 119 N.M. 390, 394, 890 P.2d 1322, 1326 (Ct.App.1994) (noting, in a case involving the transfer of both irrigation well and ditch rights, that "[s]ection 72–5–23 sets out the mechanism for severing and transferring water rights from the lands to which they are appurtenant.").

the State Engineer's administrative requirements for licensure automatically caused the severance process to cease and the water rights to pass along with the land to Turner.

{14} In *Sun Vineyards*, the operator of a vineyard obtained a permit from the State Engineer to sever a fraction of the appurtenant water, spread it to other land, and thereby reduce the amount of water appurtenant to the original irrigated area. *Sun Vineyards*, 107 N.M. at 525, 760 P.2d at 1291. The vineyard operator then negotiated a sale of part of the original irrigated land. *Id.* Though the operator had a permit from the State Engineer for the severance and transfer of the fractional water rights, the operator had not yet obtained a license. *Id.* at 528, 760 P.2d at 1294. When the buyer discovered the irrigated land was being conveyed with only part of its original water rights, the buyer filed suit seeking to quiet title to the original water rights, as well as specific performance and damages resulting from a breach of contract. The district court held for the buyer, ordering the seller to convey the remaining portion of the water rights. *Id.* at 527, 760 P.2d at 1293.

{15} On appeal, this Court undertook a review of the record to determine whether there was sufficient evidence to support the district court's decision. *See Sun Vineyards*, 107 N.M. at 526, 760 P.2d at 1292. This Court first analyzed the threshold issue of severance as a matter of law, and concluded that the water rights remained appurtenant to the land and passed to the buyer because a license had not issued and because the seller had not reserved the rights in the conveyance documents. *Id.* at 527, 760 P.2d at 1293. The second analysis centered upon the plaintiff's contract claim. The warranty deed in *Sun Vineyards* stated that the land came "with water rights," and the district court correctly determined that the purchaser relied on receiving the full amount of water originally appurtenant to the land. *Id.* at 528, 760 P.2d at 1294. The purchasers "had no knowledge prior to the purchase of the property that the water rights would be less than normal." *Id.*

{16} As a result, this Court upheld the order granting specific performance of the contract plus contractual damages, and the buyer received the full duty of three acre-feet per acre. *Id.* In affirming specific performance, this Court observed that, although the seller had received a permit from the State Engineer for partial transfer of water rights, thereby effecting a severance, the actual transfer of those water rights had not yet vested because no license had yet issued. *Id.* at 527, 760 P.2d at 1293. Therefore, those water rights, severed but not yet transferred, were still subject to a court order for specific performance, based upon the reasonable contractual expectations of the buyer. *See id.* at 528, 760 P.2d at 1294.

{17} We observe that the case before us might have involved two issues, as *Sun Vineyards* did: a threshold legal issue of whether water rights were severed prior to the conveyance, and a separate contract or tort issue concerning what the parties were reasonably led to believe would result from the conveyance. The threshold legal issue focuses upon whether the water rights were appurtenant at the time of the conveyance. Analysis of the threshold issue centers upon the prior actions taken by the seller to sever the water rights, as seen through the administrative procedures set forth by the State Engineer. The separate contract or tort issue examines the expectations created by the parties to the land sale contract, and the civil liability of one party to the other that may result from those expectations. The State Engineer is not a party to the contract.

{18} The parties agree they did not discuss water rights at the time of the land sale negotiations, and neither party argues there was any writing or communication that constituted a mutual understanding regarding appurtenant water rights. Instead of an implied contractual understanding between the parties, this case is based upon the threshold legal issue of whether the Bassetts had done enough, according to requirements of the State Engineer, to sever their water rights prior to the sale of land to Turner.

{19} To more fully explore this issue, we consider the applicable statutes and agency regulations, the common practice of the State Engineer, and the policy implications of our decision upon the practice of severance in the

State of New Mexico. The statutory procedures for severing and transferring water rights are set forth in Section 72–5–23:

All water used in this state for irrigation purposes, except as otherwise provided in this article, shall be considered appurtenant to the land upon which it is used, and the right to use it upon the land shall never be severed from the land without the consent of the owner of the land, but, by and with the consent of the owner of the land, *all or any part of the right may be severed from the land,* simultaneously transferred and become appurtenant to other land, or may be transferred for other purposes, without losing priority of right theretofore established, if such changes can be made without detriment to existing water rights and are not contrary to conservation of water within the state and not detrimental to the public welfare of the state, *on the approval of an application of the owner by the state engineer.* Publication of notice of application, opportunity for the filing of objection or protests and a hearing on the application shall be provided as required by Sections 72–5–4 and 72–5–5 NMSA 1978.

(Emphasis added.)

{20} In order to effect a severance, Section 72–5–23 requires consent of the landowner, and "approval of an application" by the State Engineer. Both consent of the landowner and approval of the State Engineer are present in this case. As is clear from the Bassetts' permit, the active review of an application by the State Engineer occurs during the permitting phase of the process. The proposed severance is evaluated by the State Engineer to determine whether the changed use of water may result in adverse impacts to other appropriators or may be detrimental to water conservation and the public welfare. Protests and objections are also submitted at this initial point in the process.

{21} In fulfillment of the permit requirements, the Bassetts clearly described their plan to phase out irrigation and use their water to meet growing municipal and industrial demand in the Edgewood area. In reviewing the application, the State Engineer considered the amount of water available, population projections for the area and associated water use, as well as return flow projections, before approving the application for a total diversion of no more than 1570.7 AF/year. Thus, the State Engineer's approval of the application and issuance of a permit resulted from a detailed review of the possible impacts and projected benefits with respect to the proposed use of the water. The Bassetts were in compliance with the conditions of the permit. By approving a plan to gradually convert irrigation uses to municipal and industrial uses, the State Engineer knew the plan would take years before all the water formerly used in irrigation would be fully committed to the new use. The Bassetts submitted annual applications for extensions of time before and after the sale, as provided by the formal administrative procedures of the State Engineer. 19.26.2 NMAC (2005). These applications were routinely granted.

{22} Consistent with the statute and with the Bassetts' position, the State Engineer has acknowledged to this Court that "[u]nder the typical transfer permit, the water right is automatically severed upon issuance of the permit, and the severance is not dependent upon the application of beneficial use at the new location—the severance is complete upon issuance of the permit." This interpretation is supported by State Engineer Regulations, which state: "A *permit* from the state engineer is required to change the place and/or purpose of use of all or any part of a water right." 19.26.2.11(B) NMAC (2005) (emphasis added).

{23} The State Engineer's position that the water right "is automatically severed upon issuance of the permit" is consistent with the position the State Engineer took 16 years ago in *Sun Vineyards.* There, a district manager from the Office of the State Engineer testified that "once an application is filed and approved the water rights are severed from the old location and become appurtenant to the new location[.]" *Sun Vineyards,* 107 N.M. at 527, 760 P.2d at 1293. The Court nonetheless proceeded to characterize severance as a process that could be nullified should the underlying land be sold prior to issuance of a license. *Id.* In the case

before us, the Court of Appeals relied upon this characterization to conclude that because the Bassetts failed to obtain a license, the appurtenant water rights passed to Turner. *Turner*, 2003–NMCA–136, ¶ 15, 134 N.M. 621, 81 P.3d 564. Although that conclusion is proper under the facts of *Sun Vineyards*, it overreaches when applied to cases that do not involve a contract or tort dispute.

{24} The holding in *Sun Vineyards* was correct. The promise of water in the language of the deeds and evidence of the buyer's reliance indicated the parties had intended a transfer of water rights, rather than a reservation. Further, it was clear that all of the procedures necessary to the issuance of a license had not yet occurred. However, a bright line rule that a severance is interrupted upon sale of the underlying land makes little sense when a contract or tort claim does not arise. Considering the statutes, regulations and practice of the State Engineer, a better approach to the issue of severance is to recognize the issuance of a permit as giving rise to a presumption that the land and water rights are no longer appurtenant. Without more, the conveyor of title to the land who has acquired a permit need not express in the conveyance documents that which is already presumed as a matter of law: the land passes without water. *See generally* 2 Robert E. Beck, *Waters and Water Rights*, § 14.04(d)(3), 14–87 (2001) ("Case law in most states fairly consistently applies the appurtenancy rule as a rule of construction.").

{25} However, like all presumptions this, too, can be overcome. If the seller acts as if the land and water remain as one, if the seller creates reasonable expectations in the buyer contrary to the presumption of severance, then those water rights remain within the power of the court to order full relief to the parties, just as this Court did in *Sun Vineyards*. We clarify, however, that a post-severance conveyance of land, even in the absence of reservation of rights, does not nullify a severance. Individuals who hold water rights, like the Bassetts, and follow the statutory and administrative procedures to effect a severance and initiate a transfer, may convey the underlying land severed from its former water rights, without necessarily reserving those water rights to the seller in the conveyance documents.

{26} We recognize nonetheless that the safer course for the prudent seller is to expressly reserve any such water rights in the conveyance documents. *See Twin Forks Ranch, Inc. v. Brooks*, 1998–NMCA–129, 125 N.M. 674, 964 P.2d 838 (stating that appurtenant water rights, never severed by permit, passed to the buyer by contract without a reservation of rights). While a reservation in a deed may be nothing more than a simple statement, however, a permit represents a severance application to the State Engineer that describes the details of a plan to sever and transfer the water, a technical analysis by the State Engineer of the proposed severance, evaluation of impairment issues, policy review for the propriety of the transfer, and a notice and comment period during which others may protest the application. A permit is issued only after these hurdles are cleared.

{27} In contrast, the relative ease of reserving water rights in a conveyance document underscores how appropriate it is that we clarify *Sun Vineyards* by today's action. A reservation of rights in a sale document would enable a landowner to complete severance and transfer proceedings, subject to the approval of the State Engineer. Recognizing, on the one hand, a contractual reservation as effectively severing water rights, while failing, on the other hand, to recognize a permit as accomplishing the same severance, produces an anomalous result. A reservation of rights that necessarily requires completion of the administrative process ought not have greater legal significance than acquiring the permit, which is an important step in the administrative process.

{28} We conclude that the severance statute, the applicable regulations, the general practice of the State Engineer, and the permit itself all support the view that the Bassetts presumptively severed their water rights from the property upon receipt of a permit from the State Engineer. Turner presented nothing to the district court that would rebut the presumption created thereby: that the land passed to Turner without

those water rights. The district court properly disclaimed any jurisdiction over those water rights, given the absence of any need for power over those water rights to be able to accord relief to the parties.

{29} We also observe that reliance upon the issuance of a permit promotes both equity and predictability in land transactions. This approach prevents purchasers of land from claiming water rights for which they never bargained. As acknowledged by the Bassetts, prospective purchasers of land may obtain both license and permit information from the records of the State Engineer's Office. Such an approach is also supported by statute and case law recognizing that both *permitted* and licensed water rights are alienable property rights. *See* NMSA 1978, § 72-1-2.1 (1991); *KRM, Inc. v. Caviness*, 1996-NMCA-103, ¶¶ 6, 7, 122 N.M. 389, 925 P.2d 9; *Clodfelter v. Reynolds*, 68 N.M. 61, 66, 358 P.2d 626, 631 (1961).

{30} The facts of this case bring into sharp relief the need for certainty regarding severances. As conceded by the parties, Turner was aware of the Bassetts' water development activities, and even considered purchasing water from the Bassetts to supply his planned residential subdivision. Furthermore, the Bassetts were not in violation of their permit. They continued putting water to beneficial use in conformity with the plan approved by the State Engineer, and as described in their annual applications for extensions of time. The Bassetts note that under their approved plan to provide water to Edgewood, obtaining a license prior to the land sale to Turner would have been impossible, because in 1984, the Bassetts were not yet applying all the permitted water to beneficial use. A rule that automatically annuls the officially approved severance not only results in uncertainty as to the ownership of the water rights, but also emasculates the ability of the State Engineer to maintain control over the place and purpose of use of water as approved in the permit.

## CONCLUSION

{31} For the foregoing reasons, we reverse the Court of Appeals and uphold the district court's grant of summary judgment in favor of the Bassetts.

{32} **IT IS SO ORDERED.**

WE CONCUR: PAMELA B. MINZNER, PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.